UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                          :
JBCHOLDINGS NY, LLC, JANOU PAKTER, LLC,                   :
                                                          :                    12 Civ. 7555 (PAE)
                                    Plaintiffs,           :
                                                          :                 OPINION AND ORDER
                    -v-                                    :
                                                          :
JANOU PAKTER, JANOU TALENT ADVISORY                       :
INTERNATIONAL, JERRY TAVIN, GINGER PUGLIA,                :
and RYAN THEOBALT,                                         :
                                                          :
                                    Defendants.           :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        In this action, plaintiffs JBCHoldings NY, LLC and Janou Pakter, LLC bring federal

claims arising under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030 *et seq.*,

and the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, and common law claims of fraud, breach of

contract, tortious interference with contract, tortious interference with business relations, and an

accounting. Defendants Janou Pakter, Janou Talent Advisory International, and Jerry Tavin each

move to dismiss some, but not all, of the claims against them. These motions are granted in part

and denied in part. Defendant Ginger Puglia moves to dismiss all claims against her. That

motion is granted in its entirety.[1]

_____

[1] Defendant Ryan Theobalt has not been served with a summons in this action. Plaintiffs' claims
against Theobalt are therefore dismissed without prejudice, and the Court, accordingly, addresses
the allegations against him only as relevant to the other defendants.

I.      **Background**

    **A.  Factual Background**[2]

The central figure in this case is defendant Janou Pakter ("Janou"), who is alleged to be a prominent figure in the executive search industry.  Together with defendant Jerry Tavin, Janou was the owner of Janou Pakter Inc. ("JPI"), an executive search firm.  Am. Compl. ¶¶ 17–18.

Plaintiff JBCHoldings NY, LLC ("JBC") is a holding company for a number of entities in the same industry.  *Id.* ¶¶ 2, 24.  In mid-2011, JBC, seeking to expand its global recruitment operations, contacted JPI to discuss a possible transaction between the companies.  *Id.* ¶ 27.  In October and November 2011, JBC, through its managing member Bryan Zaslow, engaged in negotiations with Janou and Tavin.  *Id.* ¶¶ 32–33.  During these negotiations, Janou and Tavin made detailed projections regarding the amount of revenue JPI could earn with their assistance. *Id.* ¶¶ 33–37.  For 2013, Janou and Tavin projected that JPI's American operations could earn between $4.2 and 6.375 million.  *Id.* ¶ 35.

In January 2012, after months of negotiation, JBC purchased substantially all the assets of JPI pursuant to an Asset Purchase Agreement ("APA").  *Id.* ¶¶ 39–41, 53; *see also* Am. Compl. Ex. A (the APA).  The APA was signed by Janou, Tavin, and Zaslow.  Am. Compl. ¶ 53; APA 29.  The nominal purchase price paid by JBC was $450,000.  Am. Compl. ¶ 46.[3]  JBC paid the cash portion of this purchase price to Rosenthal and Rosenthal, a finance company that held a note on JPI's accounts receivable.  *Id.*

---

[2] The Court's account of the underlying facts in this case is drawn from the Amended Complaint (Dkt. 40) and the exhibits attached thereto, including the Asset Purchase Agreement (Dkt. 40-1).

[3] The actual amount transferred from JBC to JPI was actually $48,000, as a result of adjustments made for pre-closing accounts receivable and commissions obtained therefrom by JPI.  Am. Compl. ¶ 46.

To effectuate the purchase, JBC created Janou Pakter, LLC ("JP" and, collectively with JBC, "plaintiffs"), a wholly owned subsidiary, which would take on JPI's assets and thereafter continue in the executive search business. *Id.* ¶¶ 5, 16. Under the APA, plaintiffs purchased from JPI "everything from goodwill, customer lists, post closing accounts receivable, personal property owned by JPI and JPI's lease, to intellectual property, amongst other things." *Id.* ¶ 40.

Under the APA, Janou was required to continue to participate in the business. She agreed to help plaintiffs build their executive search business, and both Janou and Tavin agreed not to compete with plaintiffs and to make reasonable efforts to induce clients to work with plaintiffs. *Id.* ¶¶ 28, 30–31, 42; APA § 9.13. For her efforts, Janou was to be paid a commission-based salary, with a $120,000 salary guaranteed. She was also to receive a $20,000 signing bonus, and equity options that would vest at certain milestones. Am. Compl. ¶ 49. This compensation structure was based on Janou's representations that she could build a lucrative business for JP. *Id.* ¶¶ 34–38.

Janou's performance, however, fell short of these expectations: By May 2012, Janou had not signed a single new account for JP. *Id.* ¶ 56.

Plaintiffs allege that Janou failed to book any revenue for JP because, from the moment she sold JPI to JBC, she had been setting up and operating a competing enterprise, Janou Talent Advisory International ("JTAI"), in direct violation of her employment agreement. Plaintiffs allege that Janou did so with the aid of with her co-defendants: Tavin; Ryan Theobalt, a lower level employee of JP; and Ginger Puglia, the owner and operator of another executive search firm, Ginger Finds.[4] *Id.* ¶¶ 60, 63.

---

[4] Plaintiffs also allege that Ginger Finds was a separate competing enterprise set up by Janou.

In June 2012, plaintiffs discovered Janou's infidelity when she left her personal email account open on a JP computer. *Id.* ¶ 62. Upon searching Janou's electronic communications, JBC and JP management found an array of emails that allegedly show that Janou: (1) had been in contact with present and former JBC clients; (2) had received fees from at least one client pursuant to an invoice marked "JTAI"; (3) had referred clients to Puglia, rather than retaining them for JP; and (4) had discussed fee-sharing arrangements with Puglia and Theobalt. *Id.* ¶ 64; *see also id.* Exs. 3–6. In essence, plaintiffs allege, these emails show that Janou was working with Tavin, Puglia, and Theobalt to steal business opportunities belonging to JBC and JP, and to divert them to her competing enterprise, JTAI. Plaintiffs further allege that Janou, Puglia, and JTAI presented their business to consumers so as to falsely trick consumers into thinking that they were receiving services from plaintiffs. *Id.* ¶ 65.

Plaintiffs further allege that Janou and her co-conspirators misappropriated JBC and JP's proprietary information, including client lists, and used these to advance their competing business. Plaintiffs theorize that Janou (or a co-defendant) obtained this information either by (1) copying it to her personal laptop and sharing it with her co-defendants; (2) lifting it from JBC's computers using a flash drive; and/or (3) obtaining it remotely via spyware. *Id.* ¶¶ 70–74.

On July 18, 2012, JP terminated Janou's employment. *Id.* ¶ 76.

**B. Procedural History**

On October 10, 2012, plaintiffs filed the original Complaint in this case. Dkt. 1. The Complaint alleged a violation of the CFAA, and state law causes of action for fraud, breach of contract, tortious interference with contract, and an accounting. On November 13, 2013,[5]

---

[5] Counsel on both sides have had considerable trouble navigating the Court's admittedly finicky ECF filing system. As a result, many of their filings were rejected when first filed, only to be

plaintiffs moved *ex parte* for a temporary restraining order, which the Court denied, and for a preliminary injunction.  Dkt. 2–6.

On November 21, 2012, Puglia moved to dismiss the Complaint.  Dkt. 17.  On November 26, 2012, Janou, Tavin, and JTAI filed an opposition to plaintiffs' request for a preliminary injunction, Dkt. 21–24.  On November 29, 2012, the Court held a preliminary injunction hearing.  In an opinion read from the bench at the conclusion of that hearing, the Court denied plaintiffs' motion for a preliminary injunction.  Among other things, the Court noted, plaintiffs could not show a likelihood of success on the merits of their only federal claim, based on the CFAA, because that claim appeared deficient as a matter of law.  Dkt. 33.

On December 3, 2012, plaintiffs filed the Amended Complaint.  Dkt. 40.  It added an additional federal cause of action under the Lanham Act, as well as a state law claim of tortious interference with business relations.  On January 3, 2013, Puglia moved to dismiss the Amended Complaint, Dkt. 45 ("Puglia Br."), as did Janou and JTAI, Dkt. 50 ("Janou Br.").  On January 4, 2013, Tavin joined these motions.  Dkt. 53.  On January 22, 2013, plaintiffs filed a consolidated opposition to defendants' motions.  Dkt. 54 ("Pl. Br.").  On January 31, 2013, Janou and JTAI filed a reply, Dkt. 55 ("Janou Reply Br."), in which both Puglia and Tavin joined, Dkt. 56–57.  On March 7, 2013, the Court heard argument on defendants' motions.

## II.     Applicable Legal Standard

In resolving a motion to dismiss, the Court must "construe the Complaint liberally, accepting all factual allegations in the Complaint as true, and drawing all reasonable inferences in plaintiff['s] favor."  *Galiano v. Fid. Nat'l Title Ins. Co.*, 684 F.3d 309, 311 (2d Cir. 2012).

---

properly filed on subsequent dates.  The dates referenced herein represent when the filings were first attempted.

Nevertheless, the "[f]actual allegations must be enough to raise a right of relief above the speculative level," and the complaint must plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [plaintiff's claim]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Put differently, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557).

In applying these principles, the Court "must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Tarshis v. Riese Org.*, 211 F.3d 30, 39 (2d Cir. 2000) (citing *Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)). Here, this includes the APA, as well as the emails attached as exhibits to the Amended Complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

### III.   Discussion

The Court begins by addressing plaintiffs' two federal claims, under the CFAA and the Lanham Act.  The Court then addresses plaintiffs' five state law claims.

### A.  CFAA Claim

#### 1.   Statutory Framework

Plaintiffs' first claim, against all defendants, arises under the CFAA, which prohibits an enumerated list of computer crimes.  *See* 18 U.S.C. § 1030(a)(1)–(7).  The CFAA is primarily a criminal statute, but it also creates a private cause of action allowing compensatory and equitable relief for any person who suffers one of several classes of damages, including losses exceeding $5,000.  18 U.S.C. § 1030(g).

The Amended Complaint alleges violations of CFAA subsections 1030(a)(2)(C), (a)(4) & (a)(5)(C).  *See* Am. Compl. ¶¶ 81–83.  These subsections provide a cause of action against a person or entity who:

> (2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . (C) information from any protected computer;

> (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value [in excess of $5,000]; [or]

> (5)(C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.

18 U.S.C. § 1030(a).

Each of the CFAA subsections here requires that the defendant have either acted "without authorization" or "exceed[ed] authorized access."  The Court's analysis begins by analyzing the

meaning of these terms—a point as to which the parties to this case, and various federal courts, have not agreed.

### 2. "Without Authorization" or "Exceeds Authorized Access"

The CFAA does not define the term "without authorization."  It defines "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."  18 U.S.C. § 1030(e)(6).

There is no doubt that the CFAA applies to an "outside" hacker who remotely enters a computer system without authority to do so.  The harder question, relevant here, is whether an employee acts "without authorization" or "exceeds authorized access" when that employee is authorized in the first instance to access certain information, but then uses that information for an improper purpose.  Put differently, the question is whether an employee's *misuse* of an employer's information violates the CFAA where that information was obtained from a computer to which the employee was permitted access.  This question has arisen frequently, in cases like this one, in which a faithless employee has allegedly misused an employer's information.  The federal courts of appeal are divided on this issue of statutory construction.[6]

The First, Fifth, Seventh, and Eleventh Circuits have adopted what the Court will characterize as the "broad construction" of the statute.  Although these courts have taken

---

[6] The issue has also attracted considerable scholarly commentary.  *See, e.g.*, Orin S. Kerr, *Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutues*, 78 N.Y.U. L. Rev. 1596 (2003); David J. Rosen, *Limited Employee Liability Under the CFAA: A Code-Based Approach to Exceeds Authorized Access*, 27 Berkeley Tech. L.J. 737 (2012); *see also* Katherine Mesenbring Field, Note, *Agency, Code, or Contract: Determining Employees' Authorization Under the Computer Fraud and Abuse Act*, 107 Mich. L. Rev. 819 (2009); Warren Thomas, Note, *Lenity on Me:* LVRC Holdings, LLC v. Brekka *Points the Way Toward Defining Authorization and Solving the Split over the Computer Fraud and Abuse Act*, 27 Ga. St. U. L. Rev. 379 (2011).

approaches to this outcome that differ subtly, each circuit has held that the statutory terms

"without authorization" and/or "exceeds authorized access" are broad enough to reach the

situation in which an employee misuses employer information that he or she is otherwise

permitted to access.  *See, e.g.*, *United States v. John*, 597 F.3d 263, 271–72 (5th Cir. 2010)

(employee "exceed[ed] authorized access" when he used employer information, to which he had

access for other purposes, to perpetrate a fraud); *United States v. Rodriguez*, 628 F.3d 1258,

1263–64 (11th Cir. 2010) (employee "exceed[ed] his authorized access" when he accessed

information for a non-business reason in violation of employer policy); *Int'l. Airport Ctrs.,

L.L.C. v. Citrin*, 440 F.3d 418, 420 (7th Cir. 2006) (based on principles of agency, employee's

authorization to use employer's laptop ended once he violated duty of loyalty to employer, and

thus employee accessed computer "without authorization"); *EF Cultural Travel BV v. Explorica,

Inc.*, 274 F.3d 577, 581 (1st Cir. 2001) (disloyal employee "exceed[ed] authorized access" when

he breached employer confidentiality agreement by helping competitor obtain proprietary

information).

      By contrast, the Fourth and Ninth Circuits have read these terms more narrowly (the

"narrow approach").  They have held that the statute does not reach the mere misuse of employer

information or violations of company use policies.  *See, e.g.*, *WEC Carolina Energy Solutions

LLC v. Miller*, 687 F.3d 199, 203–07 (4th Cir. 2012) (rejecting agency-based theory and holding

that employee who downloaded an employer's confidential information, emailed it to his

personal account, and provided that information to employer's competitor was not liable under

CFAA); *United States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012) (en banc) (holding that "the

CFAA does not extend to violations of [employee] use restrictions," where employee of

executive search firm used employer's information, in violation of a non-compete agreement, to
set up competing executive search firm).

The Second Circuit has not squarely addressed the issue.[7]  District courts within the
Second Circuit have taken opposing views.  *Compare United States v. Aleynikov*, 737 F. Supp.
2d 173, 190–94 (S.D.N.Y. 2010) (Cote, J.) (taking the narrow approach, and stating that "[t]he
phrases 'accesses a computer without authorization' and 'exceeds authorized access' cannot be
read to encompass an individual's misuse or misappropriation of information to which the
individual was permitted access.  What use an individual makes of the accessed information is
utterly distinct from whether the access was authorized in the first place."), *Advanced Aerofoil
Techs., AG v. Todaro*, No. 11 Civ. 9505 (ALC)(DCF), 2013 WL 410873, at *7 (S.D.N.Y. Jan.
30, 2013) (Carter, J.) (narrow approach), *Univ. Sports Publ'ns Co. v. Playmakers Media Co.*, 725
F. Supp. 2d 378, 383–84 (S.D.N.Y. 2010) (Holwell, J.) (narrow approach), *and Orbit One
Commc'ns, Inc. v. Numerex Corp.*, 692 F. Supp. 2d 373, 384–86 (S.D.N.Y. 2010) (Kaplan. J.)
(narrow approach), *with Mktg. Tech. Solutions, Inc. v. Medizine LLC*, No. 09 Civ. 8122 (LLM),
2010 WL 2034404, at *7 (S.D.N.Y. May 18, 2010) (McKenna, J.) (broad approach), *Calyon v.
Mizuho Secs. USA, Inc.*, No. 07 Civ. 2241 (RO), 2007 WL 2618658, at *1 (S.D.N.Y. Sept. 5,

---

[7] The Second Circuit's decision in *United States v. Morris* is inapposite.  928 F.3d 504 (2d Cir.
1991).  The defendant there was a graduate student who used his access to a university's
computer system to upload malware.  The malware then spread throughout the internet (then in
its infancy) and caused many computers to crash.  *Id.* at 505–06.  In affirming Morris's
conviction under an earlier version of a different provision of the CFAA, the court found that
Morris had acted "without authorization" when he used "a special and unauthorized access route
into computers" that he lacked authority to access.  *Id.* at 510.  *Morris* does not address the
question presented by cases in which a defendant had authority to access a computer but misused
or misappropriated information from that computer.  *See United States v. Aleynikov*, 737 F.
Supp. 2d 173, 193 n.24 (S.D.N.Y. 2010) (agreeing that *Morris* is distinguishable).

2007) (Owen, J.) (broad approach), *and Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238,

253 (S.D.N.Y. 2000) (Jones, J.) (broad approach).

  This Court finds the narrow approach to be considerably more persuasive:  When an

employee who has been granted access to an employer's computer misuses that access, either by

violating the terms of use or by breaching a duty of loyalty to the employer, the employee does

not "exceed authorized access" or act "without authorization."

  In reaching this conclusion, the Court begins with the plain meaning of the statute.  *See*

*Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir. 2010).  The term "without authorization" is not

defined.  Accordingly, it must be given its "ordinary, contemporary, common meaning."  *Perrin*

*v. United States*, 444 U.S. 37, 42 (1979).  The common meaning of "without authorization" is

"without any permission at all."  *Aleynikov*, 737 F. Supp. 2d at 191 (collecting contemporary

dictionary definitions); *see also WEC Carolina*, 687 F.3d at 204 (common meaning of

"authorization" is "formal warrant, or sanction" (citing *Oxford English Dictionary* (2d ed. 1989;

online version 2012))).  Thus, an employee "accesses a computer without authorization" when he

does so without permission to do so.  This definition plainly speaks to permitted *access*, not

permitted *use*.

  As for the term "exceeds authorized access," it is defined to mean "to access a computer

with authorization and to use such access to obtain or alter information in the computer that the

accesser is not entitled so to obtain or alter."  18 U.S.C. § 1030(e)(6)).  By its plain terms, this

definition also speaks to access, not use.  It therefore does not speak to the misuse of permitted

access or the misappropriation of information which an employee is authorized to access.  *See*

*Aleynikov*, 737 F. Supp. 2d at 191–92; *WEC Carolina*, 687 F.3d at 204; *see also Nosal*, 676 F.3d

at 857 (rejecting contrary statutory interpretations).  Moreover, reading this definition to turn on

11

the employee's *purpose* in making use of his permitted access to the information, as the Seventh Circuit does, would effectively add to the statute a subjective intent requirement that Congress did not impose.  *See LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133 (9th Cir. 2009) ("No language in the CFAA supports LVRC's argument that authorization to use a computer ceases when an employee resolves to use the computer contrary to the employer's interest."); *Aleynikov*, 737 F. Supp. 2d at 194 (the broad approach "would require an analysis of an individual's subjective intent in accessing a computer system, whereas the text of the CFAA calls for only an objective analysis of whether an individual had sufficient 'authorization'").

As between the two statutory terms within the CFAA, they cover distinct although parallel wrongs.  *See id.*; *Citrin*, 440 F.3d at 420.  An employee acts "without authorization" when he accesses a computer without permission to do so; an employee "exceeds authorized access" when he has permission to access certain information on a computer, but accesses other information as to which he lacks permission.  *See Nosal*, 676 F.3d at 858; *WEC Carolina*, 687 F.3d at 204; *Aleynikov*, 737 F. Supp. 2d at 191–92.  Neither of these definitions, however, is addressed to the circumstance where an employee has permission to access certain information and then uses that information for an improper purpose.

A review of the statute as a whole confirms the narrow interpretation.  *See Orbit One Commc'ns.*, 692 F. Supp. 2d at 385.  The CFAA defines "loss" as "a reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).  In *Nexans Wires S.A. v. Sark-USA, Inc.*, the Second Circuit affirmed the district court's reading of this provision to exclude losses incurred as a result of

12

plaintiff's misappropriation of proprietary information.  166 F. App'x 559, 563 (2d Cir. 2006)

(summary order).  The Second Circuit's analysis there implicitly shows that the statute as a

whole does not reach misappropriation of lawfully accessed information:  It would be illogical

for the statute to prohibit misappropriation of employer information, but not to define loss to

include the losses resulting from that misappropriation.  *See Jet One Grp., Inc. v. Halcyon Jet*

*Holdings, Inc.*, No. 08-CV-3980 (JS), 2009 WL 2524864, at *6 (E.D.N.Y. Aug. 14, 2009)

(reading *Nexans* to stand for the proposition that "the Second Circuit has implicitly adopted the

narrow view").[8]

Although the Court does not find the statute ambiguous, had there been ambiguity as

between the broad and narrow constructions, the rule of lenity would apply, because the CFAA

is primarily a criminal statute.  *See Univ. Sports Publ'ns*, 725 F. Supp. 2d at 384; *Orbit One*

*Commc'ns.*, 692 F. Supp. 2d at 386.  "The rule of lenity requires ambiguous criminal laws to be

interpreted in favor of the defendants subjected to them."  *United States v. Santos*, 553 U.S. 507,

514 (2008)  And, "when choice has to be made between two readings of what conduct Congress

has made a crime, it is appropriate, before we choose the harsher alternative, to require that

---

[8] Although not necessary to the Court's decision, the legislative history of the CFAA accords
with the  narrow interpretation of "exceeds authorized access."  In 1986, Congress amended the
CFAA to substitute the term "exceeds authorized access" for the phrase "having accessed a
computer with authorization, uses the opportunity such access provides for purposes to which
such authorization does not extend."  *See* S. Rep. No. 99-432, at 9, *reprinted in* 1986
U.S.C.C.A.N. 2479, 2486.  The former definition had been directed at the sort of employee
misuse of authorized access at issue here.  But it was replaced with a narrower prohibition.
Congress's intent in doing so, the Senate Report states, was to "remove[] from the sweep of the
statute one of the murkier grounds of liability, under which a Federal employee's access to
computerized data might be legitimate in some circumstances, but criminal in other (not clearly
distinguishable) circumstances that might be held to exceed his authorization."  *Id.* at 21, 1986
U.S.C.C.A.N. at 2494–95.  The broad reading of "exceeds authorized access" is inconsistent with
this expression of legislative intent.  *See Nosal*, 676 F.3d at 858 n.5; *Aleynikov*, 737 F. Supp. 2d
at 192 n.23.

Congress should have spoken in language that is clear and definite." *Jones v. United States*, 529

U.S. 848, 863 (2000) (citation omitted).  Put differently, if Congress seeks to make a federal

crime out of an employee's misuse of his work computer, it is required to say so clearly.  *See*

*Nosal*, 676 F.3d at 863.

      Indeed, the broad reading of "exceeds authorized access" has breathtaking implications.

It would federalize, and potentially subject to federal criminal law, quotidian abuses by

employees that have historically been the sole ambit of state employment and criminal law.  *See*

*generally Nosal*, 676 F.3d at 860–63 (describing the many common violations of employer

computer use policies that would subject employees to criminal liability under the broad reading

of the statute).[9]  Those circuit courts that have adopted the broad approach appear to have

"looked only at the culpable behavior of the defendants before them, [without] consider[ing] the

effect on millions of ordinary citizens caused by the statute's unitary definition of 'exceeds

authorized access.'"  *Id.* at 862; *see also WEC Carolina*, 687 F.3d at 206 ("[W]e reject any

interpretation that grounds CFAA liability on a cessation-of-agency theory.  The deficiency of a

rule that revokes authorization when an employee uses his access for a purpose contrary to the

employer's interests is apparent:  Such a rule would mean that any employee who checked the

latest Facebook posting or sporting event scores in contravention of his employer's use policy

would be subject to the instantaneous cessation of his agency and, as a result, would be left

without any authorization to access his employer's computer systems.").

---

[9] For example, as the Ninth Circuit recognized, employer policies commonly prohibit use of
company computers for "nonbusiness purposes." *Nosal*, 676 F.3d at 860.  Under the broad
approach, a violation of such a policy (*e.g.*, to visit a news or sports website, where the employer
has forbade employees from doing so) could potentially trigger application of the CFAA.

The broad reading would also, therefore, create a federal cause of action for incidents and injuries traditionally governed by state contract and tort laws.  *See Nosal*, 676 F.3d at 860.  This case, in fact, supplies an excellent example.  If plaintiffs' federal claims (under the CFAA and the Lanham Act) were to fall, plaintiffs would not want for a remedy:  They have also alleged a host of state law contract and tort claims.  Those state law causes of action have traditionally been used to remedy misappropriation of information by faithless employees.  Yet because computers today are ubiquitous, the broad reading of the CFAA would permit such localized wrongs—breaches of contract, in form if not substance—to be litigated in federal court.  Absent a clearer statement, the Court does not ascribe to Congress an intent thus to dramatically expand federal criminal and civil jurisdiction.

### 3.    Application

Applying these principles to the Amended Complaint, plaintiffs plausibly allege that Janou and Theobalt took JBC's client lists and other proprietary information and used that information to set up a competing enterprise.  *See* Am. Compl. ¶¶ 71, 73, 74.  However, nowhere in the Amended Complaint is there any allegation that Janou or Theobalt lacked the authority to access this information.  *Compare id.* ¶ 74 ("Janou and Theobalt exceeded their authorized access . . . when they took the names of candidates…") *with* ¶ 75 ("Puglia and Tavin never had authorization to access, or use, Plaintiffs' electronically stored information.").  Thus, although Janou's alleged actions violated plaintiffs' electronic media policy, *see id.* ¶ 55, such misuse does not state a claim under the CFAA, because an employee does not "exceed[] authorized access" or act "without authorization" when she misuses information to which she otherwise has access.

15

Plaintiffs' allegation that Janou "still has not returned two company notebook computers . . . with Plaintiffs' electronically stored information still contained thereupon" fares no better. Am. Compl. ¶ 84. There is no allegation that Janou lacked access to these computers, or the information stored therein, in the first instance. Janou's failure to return these computers upon her discharge might give rise to one or more common law causes of action. It does not state a claim under the CFAA.

The Amended Complaint does, however, include certain allegations that, if sufficiently pled, would state a cause of action under the CFAA. As noted, the CFAA *does* apply to the situation where an "outside hacker" obtains information to which he never had access. In this vein, plaintiffs allege that "someone, currently believed to be Janou, or one of her agents, placed a flash memory drive on JBC and JP computer servers . . . in an effort to surreptitiously rip information from the drives." Am. Compl. ¶ 70. Similarly, plaintiffs allege:

> Plaintiffs' technology personnel found spyware and malware on Plaintiffs' servers. They believe the spyware to have been possibly remotely placed. Further, they believe it possible that information was taken remotely by Janou and Puglia. Indeed, according to IT personnel, Janou could have passed along her login-information to Puglia, in excess of her authorized use, which would explain the placement, remotely of spyware or the remote removal of Plaintiffs' data.

*Id.* ¶ 72. Plaintiffs also allege that, upon information and belief, "all Defendants" have been using the two notebooks belonging to plaintiffs that Janou has yet to return. *Id.* ¶ 84. Notably, however, plaintiffs qualify these allegations by stating that "damage to Plaintiffs' servers renders it difficult, at this time, to say for certain [what happened]" and that plaintiffs' "investigation is as of yet, incomplete." *Id.* ¶¶ 72, 85.

These are precisely the sort of speculative, "naked assertion[s]" that do not suffice to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

16

Although the plausibility requirement "is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Plaintiffs' pleadings are repeatedly couched in terms of sheer possibility, otherwise known as conjecture. *See, e.g.*, Am. Compl. ¶ 71 ("someone, *currently believed to be* Janou or one of her agents" (emphasis added)); ¶ 72 ("They believe the spyware to have been *possibly* remotely placed. Further, they believe it *possible* that information was taken remotely . . . Janou *could have* passed along her login-information . . . which *would explain* the placement . . . of spyware." (emphasis added)). Such allegations "stop[] short of the line between possibility and plausibility." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Such conjecture is not enough to state a claim.

The implausibility of plaintiffs' allegations is reinforced by their internal inconsistency. Plaintiffs allege that during Janou's alleged scheme, she was employed by JBC and had ready access to the proprietary information at issue. She could have—as plaintiffs allege she did, *see* Am. Compl. ¶ 72—simply copied the information to her personal laptop and shared it with her co-conspirators. This would have obviated the need for her to resort to the type of elaborate "outside hacker" activities in which plaintiffs alternatively speculate she engaged, such as ripping information from, or remotely placing spyware on, plaintiffs' servers. Nor would there have been any need—if the information was indeed copied to Janou's personal laptop—for Janou or her agents to continue accessing that information from retained company laptops. In sum, plaintiffs' allegations do not allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Rather, the reasonable inference that the Court draws, drawing upon "judicial experience and common sense," is that these speculative actions have been alleged for the sole purpose of salvaging a cause of action

17

under the CFAA in the event that the Court adopts (as it has) the narrower reading of the CFAA. *Id.*

In so holding, the Court is mindful that *Twombly* does not prevent a plaintiff from pleading facts "on information and belief" in appropriate circumstances. *See Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008); *see also Lindner v. Int'l Bus. Machs., Corp.*, No. 06 Civ. 4751 (RJS), 2008 WL 2461934, at *5 n.8 (S.D.N.Y. June 18, 2008) (noting that *Boykin* is not limited to *pro se* plaintiffs).  But, although a plaintiff may do so "where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible," *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citing *Iqbal*, 556 U.S. at 677), such allegations must be "accompanied by a statement of the facts upon which the belief is founded." *Prince v. Madison Square Garden*, 427 F. Supp. 2d 372, 385 (S.D.N.Y. 2006).  Plaintiffs have offered nothing but conjecture and speculation to support their belief about defendants' culpability.

For these reasons, plaintiffs' CFAA claim must be dismissed as to each defendant.

## B.  Lanham Act Claim

### 1.    Legal Framework

Plaintiffs' second claim, against all defendants except Theobalt, arises under section 43 of the Lanham Act, which provides, in relevant part:

> (1) Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
>     (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, [shall be liable].

15 U.S.C. § 1125(a).  To succeed on a claim under this section, "a plaintiff must prove (1) that

the mark or dress is distinctive as to the source of the good or service at issue, and (2) that there

is the likelihood of confusion between the plaintiff's good or service and that of the defendant."

*ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 154 (2d Cir. 2007).

Here, plaintiffs' claim is premised on "Defendants' unauthorized use of Plaintiffs' service

marks, trade names and trade dress acquired from JPI and including, but not limited to, the

names 'Janou,' 'Pakter,' 'Janou Pakter' and the JP logo."[10] Am. Compl. ¶ 91.  An individual

person's name may become a trade name "when it acquires a 'secondary meaning', i.e., when the

name comes to 'symbolize a particular business' to consumers."  *Madrigal Audio Labs, Inc. v.

Cello, Ltd.*, 799 F.2d 814, 822 (2d Cir. 1986) (quoting *Dallas Cowboys, Etc. v. Pussycat Cinema,

Ltd.*, 604 F.2d 200, 205 n.5 (2d Cir. 1979)).

Defendants do not argue, on this motion, that Janou's personal name has not acquired a

secondary meaning, nor do defendants argue that the alleged uses of Janou's name did not create

a likelihood of confusion.  Rather, they argue that plaintiffs cannot "demonstrate [their] own

right to use the mark or dress in question," a necessary precondition of a Lanham Act claim.

*Punchgini*, 482 F.3d at 154.  That is, defendants argue that plaintiffs never purchased any right to

use Janou's name as a mark, let alone exclusive rights to do so.

"[Al]though an individual may sell the right to use his personal name, a court will not bar

him from using that name unless his intention to convey an exclusive right to the use of [his]

own name is clearly shown."  *Madrigal*, 799 F.2d at 822 (citations omitted).  "Whether a person

---

[10] Plaintiffs never identify the JP logo or what it looks like.  Nor do plaintiffs make any specific
allegation regarding how defendants used the JP logo.

who sells the trade name rights to his personal name is barred from using his personal name depends on the terms of the sale." *Id.* at 823.  Here, the APA provides the relevant terms of sale.

### 2.    Application

Under the APA, JPI is the "Seller," and Janou and Tavin are "Principal Stockholders." Am. Compl. Ex. A ("APA") at 1.  The assets to be purchased under the APA are listed in § 2.1. That list includes "Personal Property."  *Id.* § 2.1.  "Personal Property" is defined to include "Intellectual Property Assets."  *Id.* § 1.27.  "Intellectual Property Assets," in turn, are defined to include "unregistered trademarks and service marks owned or used by Seller in respect of the Business and all business names and trading names currently used by Seller, including, but not limited to, Seller's corporate name."  *Id.* § 1.17.

The terms of the APA are therefore clear as to at least the following proposition: Plaintiffs purchased the right to use any unregistered trademarks or service marks "owned or used" by JPI at the time the APA was executed.  Whether plaintiffs purchased any right in Janou's personal name, therefore, turns on whether, at the time of the agreement, that name was an unregistered trademark or service mark owned or used by JPI.[11]

---

[11] Defendants argue that because JPI is denoted the "Seller" in the APA, whereas Janou is merely a "Principal Stockholder," JPI would have had no right to sell Janou's personal name.  Janou Br. 20–21.  But that does not follow:  There are certainly circumstances in which JPI might have acquired the right to use, and therefore to sell its right to use, Janou's personal name as a trade name.  For instance, in *Madrigal*, an individual named Mark Levinson sold the right to use his personal name to a company called MLAS.  799 F.2d at 817.  After Madrigal acquired the assets of MLAS, it brought suit against Levinson for using his name to market another company's products.  *Id.*  The Second Circuit found that, although Levinson had not forfeited the right to use his personal name entirely, he *had* foregone the right to use it as a trade name, that right having been transferred to Madrigal.  *Id.* at 823; *see also Guth v. Guth Chocolate Co.*, 224 F. 932, 933 (4th Cir. 1915) ("It is well settled that a person who has adopted and used his surname as a trade-mark, or trade-name, may transfer the same with the good will of a business and thereby divest himself of the right to use his name in connection with such a business.").

Plaintiffs' pleadings on this point get across the goal line, but just barely.  Plaintiffs have alleged that Janou's personal name was among the marks purchased from JPI.  Am. Compl. ¶¶ 66, 91.  Plaintiffs have not specifically alleged that Janou at some point sold the rights in her personal name to JPI, but that allegation is implicit within the broader allegation that Janou's personal name was among the marks purchased.  It can be fairly inferred from this allegation that Janou, as the principal shareholder of the company that bore her name, transferred some right to use her personal name as a trade name to JPI—after all, the company's name was Janou Pakter Inc.  And as a practical business matter, it follows that the purchaser of JPI's assets negotiated the APA at least in part on the understanding that it would be purchasing some rights in the name of the individual whose skill and reputation gave the business its value.  Therefore, for the purposes of this motion, the Court accepts as true plaintiffs' allegation that JPI had some right in Janou's name to sell in the APA.

Defendants argue, nevertheless, that the explicit terms of the APA indicate that plaintiffs did not purchase any right to use Janou's name.  Janou Br. 19–21; Puglia Br. 9–11.  The express terms of the APA, however, do not so state.  Janou's personal name is neither expressly included within nor excluded from the list of intellectual property assets sold to plaintiffs.[12]  The APA

---

Here, plaintiffs plausibly allege that Janou's personal name was a trade name of JPI.  Am. Compl. ¶ 91.  Accordingly, although discovery may yet show that JPI never had a right to sell Janou's personal name as a trade name, the Court must assume that JPI had such a right.  *See Levitt Corp. v. Levitt*, 593 F.2d 463, 465–68 (2d Cir. 1979) (where William Levitt, controlling shareholder of Levitt and Sons, sold his business and the right to use the registered mark "Levitt," court and parties assume that Levitt "does not have any right to use the name 'Levitt' as a corporate title, trademark or trade name").

[12] Janou points out that the definition of "Personal Property" incorporates by reference a closing schedule that specifically enumerates certain assets to be purchased, but that this schedule was not attached to the APA.  Janou Br. 19–20.  The Court fails to see the significance of this omission.  Plaintiffs do not claim that Janou's personal name was among the enumerated assets

instead simply provided, in § 1.17, that plaintiffs would purchase all of the trade names currently in use by the sellers.  To be sure, in this respect, the APA is poorly drafted.  Had the APA simply enumerated the marks to be transferred, this issue would not have arisen.  But as the APA is currently written, the marks transferred are defined by reference to those marks that were owned or in use by JPI at the time of the agreement.  That in turn calls for a factual inquiry, the outcome of which the Court cannot assume on a motion to dismiss.  The Court instead must accept plaintiffs' allegation that Janou's name was among those marks.

To be sure, discovery may well prove plaintiffs' allegations to be incorrect.  It may be that JPI neither owned nor used Janou's name as a mark, and thus that JPI could not and did not sell the right to use Janou's name in the APA.[13]  Alternatively, it may turn out that plaintiffs did purchase *some* right to Janou's personal name—either the right to use Janou's personal name as a trade name, or more broadly the exclusive right to use her name commercially.[14]  And if some

---

in this schedule.  The definition of "Personal Property" *also* includes "Intellectual Property Assets," which provides the relevant definition for these purposes.

[13] It is also possible that, as defendants suggested at the preliminary injunction hearing and at oral argument on this motion, the contract will prove void or voidable.  The Court cannot resolve that question, either, without discovery.

[14] The vague terms of the APA seem highly unlikely to meet the bar set by the Second Circuit for proving that a contract conveyed away from an individual the individual the exclusive right to use her name. *See Madrigal*, 799 F.2d at 822 (a court will not bar an individual from using her personal name unless her "intention to convey an exclusive right to the use of [her] own name is *clearly shown*" (citation omitted) (emphasis added)); *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 398 (2d Cir. 2009) (reversing district court finding that agreement conferred exclusive right to use Abboud's name commercially, because agreement did not expressly state that it conveyed all of the rights to Abboud's name).  Plaintiffs argue that their exclusive right to use Janou's name is evidenced by the following APA provision:  "Janou Pakter covenants . . . that [she] shall not permit her name or any part of her name to be used by any person engaged in any business."  APA § 9.13.2. But this provision is simply a contractual obligation of Janou; it does not confer on JPI the right to use Janou's name.  *See Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 102 (2d Cir. 1985) ("[T]he mere promise of forbearance by the Sellers did not give a right of use to the buyers.").

right to use Janou's name was indeed conveyed to plaintiffs, a—or the—decisive issue here may prove to be the scope of the right conveyed. *See Madrigal*, 799 F.2d at 823 (existence of Lanham Act violation turns on the scope of the right that was sold to use defendant's personal name); *Abboud*, 568 F.3d at 401–02 (viability of fair use defense depends in part on scope of right sold); *Borghese Trademarks, Inc. v. Borghese*, No. 10 Civ. 5552 (JPO)(AJP), 2013 WL 143807, at *15 (S.D.N.Y. Jan. 14, 2013) (denying summary judgment because it is a factual issue whether challenged use of name was a trademark use or a descriptive, non-trademark use); *Falchi v. Cyber Champion Int'l, Ltd.*, No. 02 Civ. 8072 (JSR), 2003 WL 22070529, at *2 (S.D.N.Y. Sept. 5, 2003) (ambiguity regarding whether defendant intended to give up right to use his own name precluded summary judgment).

These, however, are questions that cannot be determined on this motion. Accordingly, discovery must proceed on plaintiffs' Lanham Act claims, at least as against Janou and JTAI.

There is, however, no basis for allowing plaintiffs' Lanham Act claims to proceed against Tavin. Although Tavin is nominally included as a defendant on the Lanham Act count, there are no particularized allegations that Tavin took any action that would violate the Lanham Act. Rather, every alleged action that would violate the Lanham Act is alleged to have been taken by Janou and/or Puglia. *See* Am. Compl. ¶¶ 65–67, 94–97, 100. Tavin's name is only specifically invoked in two boilerplate sentences setting forth the elements of a Lanham Act violation. *See id.* ¶¶ 92, 101. Tavin is also lumped together with all "Defendants" in a number of other boilerplate allegations. *See id.* ¶¶ 91, 93, 98–99, 102. These conclusory allegations against

---

To the extent this covenant bears on plaintiffs' Lanham Act claim, it supports defendants' argument that the APA did not give plaintiffs the exclusive right to use Janou's name, because if it did this covenant would be superfluous. In any event, by its terms, this provision speaks only to the business (trade) use of Janou's name. It cannot plausibly said to divest Janou of the right to use her name for other purposes.

Tavin are insufficient to survive a motion to dismiss.  *See Twombly*, 550 U.S. at 555.  Therefore, plaintiffs' Lanham Act claim is dismissed as to Tavin.

### 3.   Fair Use

Puglia argues that, even assuming plaintiffs had some rights in Janou's name, Puglia's alleged use of Janou's personal name constitutes fair use as a matter of law.  Section 33(b)(4) of the Lanham Act provides that fair use is a defense to liability under the Lanham Act, even if a defendant's conduct would otherwise constitute infringement.  *See Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997).  "Fair use" is defined as "a use, otherwise than as a mark, of . . . a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of [a] party."  15 U.S.C. § 1115(b)(4).  Thus, to establish a defense of fair use, Puglia must show that (1) her use is "otherwise than as a mark"; (2) the words are used in their "descriptive sense"; and (3) she acted in good faith.  *See Cosmetically Sealed Indus.*, 125 F.3d at 30.  Although fair use is an affirmative defense, it is nevertheless appropriate to grant a motion to dismiss based on this defense where the alleged conduct is fair use as a matter of law.  *See Naked Cowboy v. CBS*, 844 F. Supp. 2d 510, 515–16 (S.D.N.Y. 2012); *Arnold v. ABC, Inc.*, No. 06 Civ. 1747 (GBD), 2007 WL 210330, at *3 (S.D.N.Y. Jan. 29, 2007).

As to the first element, the Second Circuit has "equated 'use . . . as a mark' with 'the use of [a] term as a symbol to attract public attention.'"  *Abboud*, 568 F.3d at 400 (quoting *Safeway Stores, Inc. v. Safeway Props., Inc.*, 307 F.2d 495, 499 (2d Cir. 1962)).  "When use of the challenged words or phrase is accompanied by a defendant's own, conspicuously visible mark, this generally does not constitute trademark use."  *JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294, 310 (S.D.N.Y. 2010).  Puglia is not alleged to have used Janou's name to attract public

24

attention.  Rather, she is only alleged to have used Janou's name to inform clients, in emails, that she was working with Janou.  *See* Am. Compl. ¶¶ 67, 95.  And in the only email referenced in the Amended Complaint in which Puglia specifically invoked Janou's name, Puglia's own firm name, Ginger Finds, was present.  *Id.* Ex. D.  Puglia's use of Janou's name was, therefore, otherwise than as a mark.

As to the second element, the use of a mark is descriptive not merely when it is used to describe characteristics of goods, such as their size and quality, but also when words are used "in their descriptive sense."  *Cosmetically Sealed Indus.*, 125 F.3d at 30.  "Descriptive use is evident in such situations '[w]here a mark incorporates a term that is the only reasonably available means of describing a characteristic of another's goods.'"  *Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416, 426 (S.D.N.Y. 2008) (quoting *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos, Inc.*, 228 F.3d 56, 65 (2d Cir. 2000)).  Here, Puglia's use of Janou's name was descriptive:  There was no way for Puglia to inform her clients that the services she would be providing would include the assistance of Janou Pakter without invoking Janou's name.  *See Abboud*, 682 F. Supp. 2d at 313 ("Abboud's use of his name is the only 'reasonably available means' by which he can inform his potential customers that he is the designer of the 'jaz' line.").

Finally, "[a]n inference of a lack of good faith may arise from a defendant's use of a plaintiff's mark with the intent to trade upon the good will represented by that mark."  *EMI Catalogue*, 228 F.3d at 66–67.  In the email in which Puglia invokes Janou's name, she simply states that Janou and Puglia would give the client a call at the end of the week.  *See* Am. Compl. Ex. D.  Nothing whatsoever about that statement bespeaks an intention to trade on plaintiffs' good will.  And plaintiffs' allegations about Puglia's malicious intent are both conclusory and contrary to the emails attached to the Amended Complaint.  Furthermore, Puglia's use of her

own marks in the email exchange in which she invoked Janou's name is evidence of Puglia's good faith.  *See Abboud*, 682 F. Supp. 2d at 310; *Cosmetically Sealed Indus.*, 125 F.3d at 30–31; *Car-Freshener Corp.*, 70 F.3d at 270.  Thus, Puglia's alleged use of Janou's personal name constitutes fair use as a matter of law.  Plaintiffs' Lanham Act claim against Puglia is, therefore, dismissed.

### C.  State Law Claims

Plaintiffs also bring the following state law causes of action, each against various combinations of defendants:  fraud in the inducement; tortious interference with contract; tortious interference with business relations; breach of contract; and accounting.  The Court addresses each in turn.

### 1.   Fraud in the Inducement

Plaintiffs allege that Janou and Tavin committed fraud in the inducement during the negotiation of the APA.  Specifically, they allege that Janou and Tavin made false representations about their intentions to work for and not compete with JBC, and the amount of revenue they expected to generate for JBC.  Am. Compl. ¶¶ 34–38, 46, 52, 104.

A claim for common law fraud under New York law must satisfy the requirements of the heightened pleading standard under Federal Rule of Civil Procedure 9(b).  *See Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 478 F. App'x 679, 681 (2d Cir. 2012) (summary order) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004)); *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 327 (S.D.N.Y. 2006).  Rule 9(b) provides:  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  The Second Circuit has

26

clarified that although intent may be alleged generally, "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations." *Lerner v. Fleet Bank*, 459 F.3d 273, 290 (2d Cir. 2006) (citation omitted).  Rather, plaintiffs must allege facts that give rise to "a strong inference of fraudulent intent." *Space Hunters v. United States*, No. 11-3153-cv, 2012 WL 4903254, at *2 (2d Cir. Oct. 17, 2012) (summary order) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

"Proof of fraud under New York law requires a showing that '(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.'" *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415–16 (2d Cir. 2006) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996)); *see also Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 297–98 (S.D.N.Y. 2011).  These elements are essentially the same as those which must be alleged in order to establish a claim under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  *See In re Merrill Lynch Auction Rate Secs. Litig.*, No. 09 MD 2030 (LAP), 2011 WL 1330847, at *11 (S.D.N.Y. Mar. 30, 2011); *380544 Canada v. Aspen Tech. Inc.*, 544 F. Supp. 2d 199, 216 (S.D.N.Y. 2008) (pleading requirements for § 10(b) and fraudulent inducement are "identical"); *Morse v. Weingarten*, 777 F. Supp. 312, 319 (S.D.N.Y. 1991) (elements of common law fraud in New York are "substantially identical to those governing § 10(b)" and "the identical analysis applies"); *see also Iconix Brand Grp. Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 12-2735-cv, 2012 WL 6097440, at *3 (2d Cir. Dec. 10, 2012) (summary order) (assuming that "elements of

27

common law fraud claim essentially mirror those involved in a section 10(b) claim" (citation and alterations omitted)).

Janou and Tavin's projections about anticipated revenue are the type of forward-looking statements that generally do not state a claim of fraud. *See Buckman v. Calyon Secs. (USA) Inc.*, 817 F. Supp. 2d 322, 334 (S.D.N.Y. 2011) ("[S]tatements will not form the basis of a fraud claim when they are mere 'puffery' or opinions as to future events." (quoting *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994))); *see also Global Energy & Mgmt., LLC v. Xethanol Corp.*, No. 07 Civ. 11049 (NRB), 2009 WL 464449, at *3 (S.D.N.Y. Feb. 24, 2009) (forward-looking statements not actionable); *ABF Capital Mgmt. LP v. Askin Capital Mgmt., LP*, 957 F. Supp. 2d 1308, 1324 (S.D.N.Y. 1997) ("[B]ad forecasting alone is not actionable."); *cf. Prime Mover Capital Partners, L.P. v. Elixir Gaming Techs., Inc.*, 793 F. Supp. 2d 651, 672 (S.D.N.Y. 2011) (observing that "[w]hile the federal statutory safe harbor for forward-looking statements does not itself protect such statements from common law fraud claims, essentially the same considerations . . . dictate dismissal" where "plaintiffs have alleged no facts, as opposed to conclusory assertions, showing that defendants who made the statements did not believe them at the time").

Plaintiffs argue, nevertheless, that these statements are actionable, because Janou and Tavin allegedly knew them to be false when made. It is true that "a relatively concrete representation as to a company's future performance, if made at a time when the speaker knows that the represented level of performance cannot be achieved, may ground a claim of fraud." *Cohen*, 25 F.3d at 1172; *see also Capital Mgmt. Select Fund Ltd. v. Bennett*, 680 F.3d 214, 226 (2d Cir. 2012) ("[A]lthough contractual breach, in and of itself, does not bespeak fraud, it may constitute fraud where the breaching party never intended to perform its material obligations under the contract." (citation and original alterations omitted)).

28

However, to meet the heightened pleading standard under Rule 9(b), plaintiffs must allege facts sufficient to support "a strong inference of fraudulent intent," which may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields*, 25 F.3d at 1128; *see also Lerner*, 459 F.3d at 290–91.  In the analogous context of federal securities law claims, the Supreme Court has held that "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs Inc. v. Makor Issues & Rights, Inc.*, 551 U.S. 308, 324 (2007).[15]  "A complaint will survive . . . only if a reasonable

---

[15] It is worth nothing that *Tellabs* interpreted the "strong inference" requirement of the Private Securities Litigation Reform Act, and not the general pleading requirements under Rule 9(b). *See generally Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 571 n.1 (S.D.N.Y. 2011), *aff'd*, 482 F. App'x 618 (2d Cir. 2012) (summary order).  "The Second Circuit has not defined what constitutes a 'strong inference' in the common law fraud context with the level of detail that the Supreme Court used in *Tellabs*." *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 451 n.5 (S.D.N.Y. 2007).  However, numerous district courts in this Circuit have applied the *Tellabs* framework to common law fraud laws.  *See Harborview Value Masterfund, L.P. v. Freeline Sports, Inc.*, No. 11 Civ. 1638 (CM), 2012 WL 612358, at *9 (S.D.N.Y. Feb. 23, 2012) (McMahon, J.); *Stephenson*, 768 F. Supp. 2d at 571 n.1 (Holwell, J.); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, 651 F. Supp. 2d 155, 171 (S.D.N.Y. 2009) (Scheindlin, J.); *Glidepath*, 590 F. Supp. 2d at 451 n.5 (Karas, J.) ("[T]he Supreme Court's guidance in how to interpret inferences extended beyond the specific context of the PSLRA."); *see also Allianz Risk Transfer v. Paramount Pictures Corp.*, No. 08 Civ. 10420 (TPG), 2010 WL 1253957, at *9 (S.D.N.Y. Mar. 31, 2010) (Griesa, J.) (finding "no significant distinction" between the pleading requirements of Rule 9(b) and the PSLRA as practiced in the Second Circuit; *380544 Canada*, 633 F. Supp. 2d at 29 (Keenan, J.) ("Although *Tellabs* is not controlling . . . it is persuasive.").  *But see SEC v. Dunn*, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008) (Preska, C.J.) (*Tellabs* does not "indicate any intention to announce a broader Rule 9(b) standard").  The Second Circuit has assumed, without deciding, that *Tellabs* may be applied to common law fraud claims.  *See Stephenson v. PricewaterhouseCoopers, Ltd.*, 482 F. App'x 618, 622 n.5 (2d Cir. 2012) (summary order) (affirming district court's application of *Tellabs* where parties did not dispute its applicability).  Although the Court finds the *Tellabs* formulation instructive, the Court need not decide whether it is controlling, because under any standard plaintiffs have failed to allege facts giving rise to a "strong inference of fraud." *Shields*, 25 F.3d at 1128.

person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Plaintiffs offer precious few allegations that would support a strong inference of fraudulent intent.  Plaintiffs argue that Janou and Tavin must have never intended to meet their projected target revenues, because they failed to produce *any* revenue.  Thus, as plaintiffs' counsel stated at oral argument, this is not a case where defendants were simply overly optimistic, promising $200 when they could only deliver $100:  They promised millions, and allegedly brought in zilch.  But it does not follow from Janou and Tavin's failure to bring in any revenue that they never intended to earn revenues for plaintiffs.  That theory tacitly assumes that Janou and Tavin audaciously intended to promise millions, deliver nothing, set up a competing enterprise, and get away scot free, without ever being held to account in court or otherwise for their perfidy.  But plaintiffs have failed to allege a plausible motive for such an audacious and frankly unrealistic plan.  And indeed such a plan contained the seeds of its own inevitable failure, as Janou would not have received the equity options promised her under the APA conditioned on her reaching certain milestones nor, apparently, any compensation other than her $20,000 signing bonus and whatever monthly paychecks she had collected before her infidelity was discovered.  A far more likely explanation for Janou's failure to produce any revenue is that her employment relationship with plaintiffs broke down shortly after the execution of the APA, causing Janou to breach the contract, or view it as having been breached by plaintiffs, and direct her clients elsewhere.  Plaintiffs' purported inference of fraudulent intent, therefore, is not at all "strong," *Shields*, 25 F.3d at 1128, let alone "at least as compelling as any opposing inference one could draw from the facts alleged," *Tellabs*, 551 U.S. at 324.  Janou and Tavin's motions to dismiss this claim are, therefore, granted.

### 2.    Tortious Interference with Contract

Plaintiffs bring a claim of tortious interference with contract against all defendants, alleging that their actions in building a competing enterprise induced Janou and Tavin to breach the APA.  *See* Am. Compl. ¶¶ 118–125.

"Under New York law, a tortious interference claim requires a showing that a valid contract exists and that a third party with knowledge of the contract intentionally and improperly procured its breach."  *TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 88 (2d Cir. 2005).  "One asserting a tortious interference claim must also show that the defendant was not a party to the contract with which he allegedly interfered."  *Id.*; *see also Thompson v. Bosswick*, 855 F. Supp. 2d 67, 88 (S.D.N.Y. 2012) ("[O]nly a stranger to a contract, such as a third party, can be held liable for tortious interference with the contract.").  Because Janou and Tavin are parties to the APA, the contract on which these allegations are based, this claim must be dismissed as to those two defendants.  Additionally, although JTAI was not itself a party to the APA, plaintiffs make no specific allegations as to how any actions by JTAI procured Janou or Tavin's breach (which is hardly surprising, as Janou herself is alleged to have created and operated JTAI).  Accordingly, this claim must also be dismissed as to JTAI.

As to Puglia, who was not a party to the APA, plaintiffs must allege that her actions were the "but for" cause of their injury, namely Janou and/or Tavin's breach.  *See RSM Production Corp. v. Fridman*, 387 F. App'x 72, 74 (2d Cir. 2010) (summary order); *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990) ("[P]laintiff must allege that there would not have been a breach but for the activities of defendants." (citation omitted)).  This, plaintiffs have not plausibly done.  Rather, plaintiffs have alleged that Puglia "procured Janou's and Tavin's breach of the [APA] by . . . assisting in the creation of a competing enterprise and otherwise

31

booking business directly through Janou and [] JTAI, with the assistance and funding of Tavin." Am. Compl. ¶ 120.[16]  At bottom, this is an allegation that Puglia conspired with Janou and Tavin to breach their contract, which is consistent with the general thrust of plaintiffs' allegations—that Janou and Tavin never intended to honor their contractual obligations.  Where a third party acts in concert with someone who already intends to breach their contractual obligations, the third party cannot be said to be the "but for" cause of that breach.  *See Sharma v. Skaarup Ship Mgmt. Corp*, 699 F. Supp. 440, 447 (S.D.N.Y. 1988) ("The allegation that the [] defendants acted in concert with Chemical implies that Chemical would have breached its obligations even without the involvement of the [] defendants.  In no way do plaintiffs allege that the [] defendants were the motivating force behind Chemical's breach."), *aff'd*, 916 F.2d 820; *Mina Inv. Holdings, Ltd. v. Lefkowitz*, 16 F. Supp. 2d 355, 360 (S.D.N.Y. 1998) ("Plaintiffs allege only that [defendant] conspired or acted with MECO and MECO Holdings, and thus do not foreclose the possibility that MECO and MECO Holdings would have violated the Purchase Agreement regardless of [defendant's] participation.  Thus Plaintiffs have not alleged that there would not have been a breach but for [defendant's] conduct.").  Accordingly, plaintiffs' tortious interference with contract claim must also be dismissed as to Puglia.[17]

---

[16] Similarly, plaintiffs allege that Puglia "induced" Janou's breach in a July 2, 2012 email, but that email in no way suggests that Puglia was the but-for cause of Janou's breach.  *See* Am. Compl. ¶ 191 (citing *id.* Ex. E).

[17] Plaintiffs also allege, in passing, that Puglia interfered with the employment agreement between Theobalt and JP.  Am. Compl. ¶ 123.  This allegation is not only conclusory, but it also suffers from the same failure to plead causation as the claim that Puglia interfered with the APA.

### 3.   Tortious Interference with Business Relations

Next, plaintiffs bring a claim of tortious interference with business relations against Janou and Puglia, alleging that they interfered with plaintiffs' client relationships.  Only Puglia moves to dismiss this claim.

Under New York law, the elements of tortious interference with business relations are: "(1) [plaintiff] had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship."  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003)).  The New York Court of Appeals has explained that:

> where a suit is based on interference with a nonbinding relationship, the plaintiff must show that defendant's conduct was not "lawful" but "more culpable."  The implication is that, as a general rule, the defendant's conduct must amount to a crime or an independent tort.  Conduct that is not criminal or tortious will generally be "lawful" and thus insufficiently "culpable" to create liability for interference with prospective contracts or other nonbinding economic relations.

*Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004).  An exception to the rule requiring criminal or independently tortious conduct "has been recognized where a defendant engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs."  *Id.* (citation omitted).  But this exception "clearly does not apply" in the situation where defendant is motivated by "normal economic self-interest."  *Id.*

Here, plaintiffs allege that "Puglia acted solely out of malice in interfering with Plaintiffs' relationships with [clients]."  Am. Compl. ¶ 132.  This allegation is not only conclusory, but it is also inconsistent with plaintiffs' other allegations that Puglia interfered with plaintiffs'

33

relationships to gain a competitive advantage.  *See id.* ¶¶ 64, 69, 95.  Such competitive

behavior— *i.e.*, actions taken in furtherance of "normal economic self-interest"—is not

actionable under New York law.  *Carvel*, 3 N.Y.3d at 190.  Nor has plaintiff plausibly alleged

that any of Puglia's conduct constituted criminal or independently tortious conduct:  As

discussed in Part III(A), *supra*, plaintiffs allegations that Puglia used "improper and illegal

means in impermissibly obtaining Plaintiffs' trade secrets," *see* Am. Compl. ¶ 133, fail to state a

claim under the CFAA.  Accordingly, this claim must be dismissed as to Puglia.

### 4.   Other Claims

Plaintiffs also bring a breach of contract claim against Janou and Tavin, who have not

moved to dismiss this cause of action.

Finally, plaintiffs bring a claim for an accounting.  Although originally alleged as to all

defendants, plaintiffs have since withdrawn the claim as to Puglia.  *See* Pl. Br. 24.  The other

defendants have not moved to dismiss this claim.

## CONCLUSION

For the foregoing reasons, the Court holds as follows:  Count I (CFAA) is dismissed as to

all defendants; Count II (Lanham Act) is dismissed as to Puglia and Tavin, but not as to Janou

and JTAI; Count III (fraud) is dismissed as to Janou and Tavin; Count IV (breach of contract)

survives as to Janou and Tavin; Count V (tortious interference with contract) is dismissed as to

all defendants; Count VI (tortious interference with business relations) is dismissed as to Puglia,

but not Janou; and Count VII (accounting) is dismissed as to Puglia, but not Janou, Tavin, or

JTAI.

Put another way, the following claims remain as to the following defendants: Lanham Act (Janou and JTAI); breach of contract (Janou and Tavin); tortious interference with business relations (Janou); and accounting (Janou, Tavin, and JTAI).

All counts have been dismissed as to Ginger Puglia. The Clerk of Court is therefore directed to terminate her from this case.

The Clerk of Court is also directed to terminate the motions pending at docket numbers 41 and 48.

The parties remaining in the case are directed to submit a joint civil case management in accordance with the Court's Individual Rules no later than March 28, 2013. That plan should provide for the close of discovery on July 12, 2013. Any party wishing to move for summary judgment shall file a pre-motion letter, in accordance with the Court's Individual Rules, no later than July 26, 2013. Any party opposing such a motion shall file a responsive letter by July 31, 2013. The next conference in the case will be held on August 1, 2013, at 10:00 a.m.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 20, 2013
       New York, New York